IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| JULIANNA VAUGHN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-4177-CV-C-NKL |
| ) | |
| MICHAEL LOGSDON, ) | |
| DENA TOLSON, ) | |
| RICK WALLACE, ) | |
| and ) | |
| PATRICIA BOSTON, ) | |
| ) | |
| Defendants. ) | |

**ORDER**

Pending before the Court is a Motion for Summary Judgment [Doc. # 79] filed by Michael Logsdon ("Logsdon"), Dena Tolson ("Tolson"), and Rick Wallace ("Wallace") (collectively "Defendants"). Defendant Patricia Boston ("Boston") does not join in the pending Motion. For the reasons set forth below, the Court grants Defendants' Motion.

**I.      Background**

Julianna Vaughn ("Vaughn") was the biological mother of Robert Hughes, III ("Robert"). Robert was placed into foster care by the Department of Social Services, Division of Family Services ("DFS"). Boston was Robert's foster mother and they resided at 1103 Meadows Place in Jefferson City, Missouri. On May 30, 2000, there was a fire at the Boston residence and Robert was killed in the fire. The fire was suspected to be the result of arson, but nobody has been charged or convicted with a crime.

1

The Boston home was a three-bedroom residence. In May 2000, at the time of the fire, there were nine people living in the home: five foster children, Boston, Boston's seventeen-year-old daughter, Boston's fiancee, and his fifteen-year-old son. Boston's fiancee was named Bernard Lamont Davis ("Davis"). Damien Vaughn ("Damien"), Robert's cousin, was one of the other five foster children residing in the home. Because of their close familial relationship, Damien and Robert were considered a sibling group under DFS regulations.[1]

Rick Wallace ("Wallace") was the DFS child care worker assigned to oversee Robert's care. Dena Tolson ("Tolson")[2] was Wallace's supervisor.

Boston was a licensed foster parent. Davis was not a licensed foster parent and he had not been required to submit to a background check. Davis had previously served time in prison for felony assault and he had been convicted of arson, although a criminal background check conducted by the Missouri Highway Patrol did not reveal his arson conviction and it is unclear when or where he was convicted. *See* Ex. 6.

Missouri regulations require DFS employees to make home visits to foster homes on a monthly basis, but DFS records do not reflect such visits for the Boston home. Additionally, an order from the Cole County Circuit Court in Damien Vaughn's case required that DFS "have contact with the child/family" on a weekly basis. *See* Pl. Ex. 15.

---

[1] DFS guidelines do not normally allow more than six children in a home that is serving foster children. However, DFS may exceed that limit in order to keep a sibling group together.

[2] Tolson is now known as Dena Driver. In the interest of consistency with the pleadings, the Court will refer to her as Tolson only.

The order pertained only to Damien--not to Robert. Wallace was at the hearing where the order was entered in his role as the DFS worker monitoring Damien's proceedings.

After the fire, the remaining foster children in Boston's home relocated to the home of Boston's sister who was also a licensed foster care provider for DFS. Boston and Davis also moved to that home. When DFS learned that Davis was in the home, it removed the remaining foster care children. In October 2000, DFS revoked Boston's foster care license for her failure to disclose Davis's presence in the home.

### A. Communication regarding Boston

In January 2000, a subordinate of Tolson's prepared an Adoption Training Assessment regarding Boston and listed Boston's address as 404 Hart Street in Jefferson City, Missouri. Tolson approved the Assessment on March 10, 2000.

A DFS form dated March 10, 2000, reflected Boston's address at 1103 Meadows Place. *See* Pl. Ex. 19. Tolson approved the document. Also, DFS was sending Boston's foster parent payment checks to her residence at 1103 Meadows Place. *See* Pl. Ex. 20.

On March 16, 2000, Lisa Wegman ("Wegman") conducted a home review of Boston's residence, presumably at 1103 Meadows Place. *See* Pl. Ex. 9. According to the review, Boston was cited for not having "[a]ll flammable liquids, matches, cleaning supplies, poisonous materials, medicines, and alcohol inaccessible to children." *Id.* The review does not specify what hazardous materials were accessible to the children. According to Tolson's deposition, she would normally allow a home three to five days to come into compliance after a finding such as this. In her deposition, however, she did not

address whether a reinspection would occur within a certain time period after a violation was observed. Boston's home was not inspected again until after the fire in May.

On May 4, 2000, Wegman sent Tolson a letter about several cases. *See* Pl. Ex. 4. The letter included the following information regarding Boston:

> Patricia Boston keeps giving me the 'run-around' as I need her homework before I can complete her home study. I have even offered to drop off another STARS book for her complete the homework again. She stated that she wanted to look for her homework so she didn't have to do it again and that she would get back to me. I have also informed her that her fiancee needs to complete the STARS program as well and tried to encourage him to take our classes that have already started, but he did not get back with me. Any suggestions as to how to get the homework from her would be helpful.

*See* Pl. Ex. 4 at p. 2.

On June 6, 2000--approximately one week after the deadly fire--Maureen Monaghan sent an e-mail message to Winston Rutledge with a series of questions about the fire and the circumstances at 1103 Meadow Place. *See* Pl. Ex. 5. There are handwritten notes attached to the e-mail message. The author of the handwritten notes is not identified by the parties, but presumably it is Rutledge responding to Monaghan's inquiries. According to the handwritten notes, DFS knew that Davis was living in the home with Boston and that he had not undergone a background check. It also states that an unidentified supervisor spoke with Boston about Davis's non-compliance with DFS requirements. The notes reflect Davis's convictions and they are the only mention of his arson conviction anywhere in the record. It is unclear when DFS became aware of this information since the notes were written after the fire.

4

### B. Boston's Affidavit

Boston filed an affidavit in support of Vaughn's opposition to the pending Motion. *See* Pl. Ex. 3. According to the affidavit, Boston relocated to 1103 Meadows Place on February 1, 2000. She states that both Tolson and Wallace were "aware that I had relocated" to the new residence. She also states that both Tolson and Wallace were "aware that [] Davis resided with me and the foster children at the residence." She states that she informed Tolson and Wallace about Davis in February 2000.

According to Boston, she consistently exceeded the number of children allowed by DFS regulations and her license and that Defendants were aware of those violations. She also claims that Tolson and Wallace failed to tell her that she could not have more children in her home than the number specified on her license.

### C. Vaughn's Complaint

Vaughn's Complaint [Doc. # 1] asserts claims against the Defendants for Robert's wrongful death (Count I); due process violations on behalf of Robert under 42 U.S.C. § 1983 (Count III); and failure to train and supervise in violation of 42 U.S.C. § 1983 (Count IV). The claims against the Defendants are in their individual capacities only. *See* Order [Doc. # 39] (dismissing Vaughn's claims against Defendants in their official capacities).

In her opposition to the pending Motion, Vaughn concedes that summary judgment is proper as to Michael Logsdon ("Logsdon"). *See* Opposition [Doc. # 86] at p. 1.

The remaining Defendants have moved for summary judgment on all claims.

5

## II. Discussion

### A. Vaughn's Claims Under Section 1983

Vaughn argues that Defendants violated her and Robert's constitutional rights when they failed to make monthly home visits or adequately train Boston about how to maintain a safe home. According to Vaughn, Defendants' conduct caused Robert's death and constituted a violation of 42 U.S.C. § 1983.

A plaintiff under section 1983 must prove that a state actor violated a constitutional right which caused the plaintiff damage. *Hart v. City of Little Rock*, 432 F.3d 801, 804 (8th Cir. 2005) (citations omitted). Normally, a state is not obligated to protect individuals from harm at the hands of private actors, *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989), but a substantive due process right to protection can arise where the state has custody of a person. *Gregory v. City of Rogers, Ark.*, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc), *cert. denied*, 507 U.S. 913 (1993). There is no dispute that DFS had custody of Robert at the time of his death. Thus, the only question is whether Vaughn has presented sufficient evidence to support a substantive due process claim.

To determine whether a substantive due process claim has occurred, a court must determine "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 848 n. 8 (1998); *Hawkins v. Holloway*, 316 F.3d 777, 780 (8th Cir. 2003). In *Hart*, the Eighth Circuit discussed what kind of conduct may or

6

may not "shock the conscience." It stated:

> Mere negligence can never be conscience-shocking and cannot support a
> claim alleging a violation of substantive due process rights . . . . Indeed, we
> have held more than once that gross negligence is not actionable under
> section 1983 . . . . Instead, actionable substantive due process claims
> involve a level of abuse of power so brutal and offensive that they do not
> comport with traditional ideas of fair play and decency . . . . Proof of intent
> to harm is usually required, but in some cases, proof of deliberate
> indifference, an intermediate level of culpability, will satisfy this
> substantive due process threshold.

*Hart*, 432 F.3d at 805-06 (internal citations omitted). Deliberate indifference requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (defining "deliberate indifference" in the Eighth Amendment context); *Lewis*, 523 U.S. at 849-50 (equating "deliberate indifference" in the Eighth Amendment context with "deliberate indifference" in the context of substantive due process rights violations).

There is no evidence that Tolson acted with deliberate indifference. Even if Vaughn is correct that Tolson knew Boston had moved to 1103 Meadows Place, knew Davis was living at the residence, and knew the house was overcrowded, Tolson is still not responsible for Robert's injuries because she was a supervisor rather than a caseworker assigned to Robert's file. Section 1983 liability "requires a causal link to, and direct responsibility for, the deprivation of rights." *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990) (citations omitted). No such link exists between Tolson and Vaughn's injuries. At most, Tolson was negligent in her supervision of Wallace, but

7

negligence is an insufficient basis for imposing section 1983 liability.

Similarly, there is no evidence that Wallace acted with deliberate indifference. The only evidence Vaughn has to show that Wallace knew about the number of people living at the residence or the fact that Davis was living there is Boston's affidavit which states that Wallace knew about Davis. Boston's affidavit, however, does not offer any specific facts to support its assertion. For example, Boston does not identify when or how she told Wallace about Davis nor does she state what she told him. The affidavit is, at best, conclusory and cannot be the basis for denying a summary judgment motion. *See Rose-Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998) (conclusory affidavits, standing alone, cannot create genuine issue of material fact precluding summary judgment). *See also Federal Trade Commission v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) (conclusory affidavit without detailed facts and supporting evidence is insufficient to defeat summary judgment); *Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 557 (10th Cir. 2001) (same); *Hall v. Bodine Electric Co.*, 276 F.3d 345, 354 (7th Cir. 2002) (same). Thus, Boston's affidavit is insufficient to create a disputed issue of material fact.

Vaughn also argues Wallace would have known about Davis and the overcrowding at the home had he conducted the monthly visits required by DFS regulations. Wallace's failure was no doubt incompetent and negligent, but negligent conduct is insufficient to prove a section 1983 deliberate indifference claim. *See Hart*, 432 F.3d at 805-06. Even if characterized as gross negligence, Wallace's conduct does not rise to deliberate

8

indifference. *S.S. v. McMullen*, 225 F.3d 960, 962 (8th Cir. 2000) (en banc) ("[w]e have held more than once that gross negligence 'is not actionable . . . under § 1983'") (quoting *Sellers By and Through Sellers v. Baer*, 28 F.3d 895, 902-03 (8th Cir. 1994)).

Finally, even if Wallace and Tolson did know about Davis's presence and the overcrowding in Boston's home, there is insufficient evidence to support an inference that Davis set the fire or that Wallace and Tolson acted with deliberate indifference to a known risk that Davis would set a fire. Nor is there evidence that overcrowding contributed to Robert's death or that the fire was set by a child that had access to "flammable liquids" or "matches."

Vaughn's claim for negligent hiring cannot pass muster because the claim is premised on negligence and cannot constitute deliberate indifference. *See Hart*, 432 F.3d at 805-06 (disallowing negligence claims in section 1983 actions); *Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005) (defining "deliberate indifference" as "something more than negligence but less than actual intent to harm") (citations omitted).

Accordingly, the Court will grant Defendants' Motion on Vaughn's federal claims filed under section 1983.

### B. Vaughn's State Claim for Wrongful Death

Vaughn also sued Defendants for negligence under Missouri's wrongful death statute, which is found at Mo. Rev. Stat. § 537.080. Defendants have invoked official immunity to defeat Vaughn's claim.

The official immunity doctrine provides that public officials "acting within the

9

scope of their authority are not liable for injuries arising from their discretionary acts or omissions, but they may be held liable for torts committed when acting in a ministerial capacity." *Kanagawa v. State ex rel. Freeman*, 685 S.W.2d 831, 835 (Mo. 1985) (en banc), *overruled on other grounds*, *Alexander v. State*, 756 S.W.2d 539 (Mo. 1988) (en banc). The doctrine protects those officials "who, in the face of imperfect information and limited resources, must daily exercise their best judgment in conducting the public's business." *Id.* at 836 (citing *Jackson v. Wilson*, 581 S.W.2d 39, 42 (Mo. Ct. App. 1979)).

Classifying an act as discretionary or ministerial "depends upon the degree of reason and judgment required." *Id.* "[A] discretionary act requires 'the exercise of reason in the adaption of means to an end and discretion in determining how or whether an act should be done or course pursued.'" *Edwards v. McNeill*, 894 S.W.2d 678, 681 (Mo. Ct. App. 1995) (en banc) (quoting *Rustici v. Weidemeyer*, 673 S.W.2d 762, 769 (Mo. 1984) (en banc)). In contrast, a ministerial act is "of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." *Kanagawa*, 685 S.W.2d at 836 (quoting *Rustici*, 673 S.W.2d at 769).

Missouri's administrative regulations require social workers to conduct monthly visits to monitor foster children.

> Each child in care and the foster parent(s) shall be visited as often as is necessary to support the placement, but at least once a month.

Mo. Code Regs. Ann. tit. 13, § 40-73.075. The regulation, however, does not contain any consequence if the monthly visit is not made by the designated social worker.

Under Missouri law, when a statute or regulation provides "what results shall follow from a failure to comply with its terms, it is mandatory and must be obeyed, whereas, if it merely requires certain things to be done and nowhere prescribes the results that shall follow if such things are not done, the statute is merely directory." *Meloy v. Reorganized Sch. Dist. R-1 of Reynolds County*, 631 S.W.2d 933, 937 (Mo. Ct. App. 1982) (quoting *Hedges v. Dep't of Social Serv.*, 585 S.W.2d 170, 172 (Mo. Ct. App. 1979)). Missouri courts hold that merely directory statutes cannot give rise to ministerial duties and, thus, an official cannot be liable for failing to comply with a directory statute. *See Norton v. Smith*, 782 S.W.2d 775 (Mo. Ct. App. 1989); *Brummitt v. Springer*, 918 S.W.2d 909 (Mo. Ct. App. 1996).

Because section 40-73.075 of the Missouri regulations does not provide any consequence if a social worker does not make monthly visits, it is merely directory and Wallace is not liable for failing to comply with its mandate. Furthermore, courts recognize that "a social worker's handling of the care of a child may be considered inherently discretionary." *Porter*, 436 F.3d at 921 (applying Missouri law).

Similarly, Wallace is not liable for failing to comply with the Cole County Court order. While a court order can be the basis for finding a ministerial duty, *see, e.g.*, *Porter*, 436 F.3d at 921-23 (holding that a consent decree may give rise to a ministerial duty), the Cole County order required Wallace to have weekly contact with Damien's foster family.

11

It did not mandate weekly visits, and there is insufficient evidence in the record to show that Wallace did not have weekly contact with Damien's foster family. The evidence only shows that no home visits occurred. In addition, the directive related to Damien and not Robert.

The official immunity doctrine, therefore, shields Defendants from Vaughn's wrongful death claim.

Even assuming the official immunity doctrine did not protect Defendants, Vaughn's wrongful death claim would still fail. Under Missouri law, wrongful death "plaintiffs must allege and offer facts that would support finding of a causal connection" between a defendant's actions and the victim's death. *Mueller v. Bauer*, 54 S.W.3d 652, 656 (Mo. Ct. App. 2001) (citing *Brickey v. Concerned Care of Midwest, Inc.*, 988 S.W.2d 592, 596 (Mo. Ct. App. 1999)). A defendant's conduct is a cause of the death if the death would not have occurred "but for" that conduct. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860-61 (Mo. 1993) (en banc). As previously stated, there is insufficient evidence to show that Defendants' conduct contributed to Robert's death.

### III. Conclusion

Accordingly, it is hereby

ORDERED that Defendants' Motion for Summary Judgment [Doc. # 79] is GRANTED.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

12

Case 2:05-cv-04177-NKL   Document 92   Filed 06/27/06   Page 12 of 13

DATE: June 27, 2006
Jefferson City, Missouri